**APOLLO FUEL OIL, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 96–CV–4204 (RLM).**

United States District Court, E.D. New York.

April 1, 1999.

255

Frank Agostino, Calo Agostino, Hackensack, NJ, for plaintiff.

Thomas A. McFarland, United States Attorney's Office. Civil Division, Brooklyn, NY, Avery M. Ellis, U.S. Dept. of Justice, Trial Attorney, Tax Division, Washington, DC, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MANN, United States Magistrate Judge.

Plaintiff Apollo Fuel Oil ("plaintiff" or "Apollo") brought this taxpayer's suit for a refund of a $1,000 penalty assessed by the Internal Revenue Service ("IRS") upon finding that plaintiff had used a non-taxable fuel oil for taxable purposes. With the parties' consent, the case was tried before this Court on November 24, 1998. Based on the evidence adduced, the Court sustains the assessment of the penalty and directs that judgment be entered in favor of the defendant United States of America ("defendant" or "government").

### PROCEDURAL HISTORY

On March 14, 1996, the IRS assessed a $1,000 penalty against Apollo, pursuant to 26 U.S.C. § 6715(a)(2), for using non-taxable fuel for a taxable use.[1] Apollo paid the penalty and subsequently submitted a request to the IRS, seeking refund and abatement of the penalty. The IRS denied the request and this action followed. Both parties consented to have this case assigned to a magistrate judge for all purposes.

Plaintiff filed a motion for summary judgment, claiming that (1) plaintiff had acted without the *mens rea* required under the statute; and (2) the fuel oil in question contained an insufficient concentration of red dye to render it non-taxable fuel oil and thus to trigger a penalty under the statute. In an opinion issued on September 30, 1998, this Court denied plaintiff's motion in its entirety.

A bench trial was held on November 24, 1998. Plaintiff called three witnesses: Paul Pullo, a part owner of Apollo; Thomas Torre, Apollo's chief financial officer; and Giuseppe Manno, the driver of the Apollo truck that was found to have dyed fuel in its fuel tank. The government called Carl Suares, the IRS diesel compliance officer who discovered the dyed fuel at issue in this case. Both sides also introduced documentary evidence.

### FINDINGS OF FACT

Federal law imposes a tax on fuel used for motor vehicle transportation, but not on fuel used for non-transportation purposes such as home heating. *See* 26 U.S.C. §§ 4081(a)(1)(A), 4082, and 4041(b). In order to differentiate between fuels used for taxable and tax-exempt purposes, members of the oil industry are required to use a red dye to color tax-exempt oil. *See* 26 U.S.C. § 4082(a). This tax-exempt oil is commonly referred to as "red oil" or "2oil." Taxable oil used for transportation is not dyed, and is commonly referred to as "clear oil."

Apollo is a trucking company engaged in the transportation of both clear and red diesel fuel. (Tr. 8–9.[2]) Inspector Suares performed monthly inspections at plaintiff's facility, checking the dye concentration of dyed fuel and ensuring that only clear fuel was being used in the truck's fuel tanks (also referred to as "saddle tanks" or "propulsion tanks"). (Tr. 80–82, 128.)

One of these inspections occurred on March 7, 1996. Two federal inspectors from the United States Environmental

---

1. Section 6715, entitled "Dyed fuel sold for use or used in taxable use, etc.," provides in pertinent part:

    (a) Imposition of penalty.—If—

    &ast; &ast; &ast; &ast; &ast; &ast;

    (2) any dyed fuel is held for use or used by any person for a use other than a nontaxable use and such person knew, or had reason to know, that such fuel was so dyed,

    ... then such person shall pay a penalty in addition to the tax (if any).
    26 U.S.C. § 6715. The statute, which had been codified at 26 U.S. § 6714, was renumbered in August 1996. For ease of reference, this opinion uses the current citation.

2. "Tr." refers to pages in the 11/24/98 trial transcript; "PX" refers to plaintiff's exhibits at trial; "DX" refers to defense exhibits.

Protection Agency ("EPA") were also present at Apollo at that time. While Inspector Suares was checking his log, one of the EPA inspectors approached him and indicated that there was red fuel in the saddle tank of Apollo's truck four. (Tr. 85.) Inspector Suares then conducted his own inspection; using a pump, he extracted a sample of fuel from truck four's saddle tank, placed it into a clear bottle, noted that the fuel was colored red, and conducted a field test that resulted in a reading of 2.3 milligrams of dye per liter. (Tr. 86.) Inspector Suares then sealed the bottle, labeled it, and sent it by overnight courier to a laboratory (Tr. 86–89), where a test revealed that the sample contained red dye in a concentration of 3.0 milligrams per liter. (DX E.)

Manno, the driver of the truck at issue, testified that he had been delivering fuel oil for approximately six years, and had been trained by Apollo and his previous employer not to use red fuel in his propulsion tank. (Tr. 54–58.) Manno explained that he normally delivered fuel for Apollo using truck twenty-two, and that he ordinarily would fill up the propulsion tank of his truck with clear diesel fuel from a fuel pump at the Apollo terminal. (Tr. 59–60.)

On March 1, 1996, Manno was assigned to deliver clear fuel. (Tr. 60, 65–66; *see* PX 11.) According to Manno's testimony, there were no trucks available with clear diesel fuel in their storage tanks, and he thus decided to use truck four, which contained the least amount of red diesel fuel in its storage tank. (Tr. 61.) He allegedly pumped the red fuel out of truck four's storage tank, cleaned out the fuel lines ("hoses") by blowing air through them, and filled up the storage tank with clear diesel fuel. (Tr. 62.) He claimed to have been unable to fill up the propulsion tank, as the pumps "were down. . . ." (Tr. 62.)

Manno further testified that after making a few deliveries, he needed to refuel the truck's propulsion tank; he put a ticket in the truck's meter to record the amount of fuel removed, used the narrow hose from the storage tank to fill the propulsion tank about halfway, and subsequently handed the ticket to his dispatcher. (Tr. 63–65, 66, 77; *see* Tr. 53.) Although tickets from Manno's deliveries of clear fuel on March 1, 1996 were produced at trial (PX 11; Tr. 65–66), no ticket was produced for the fuel that Manno claimed to have used to refill his propulsion tank.

## CONCLUSIONS OF LAW

Pursuant to 26 U.S.C. § 6715(a)(2), "a taxpayer will be penalized if he: (1) held for use or used [red] fuel for taxable purposes; and (2) knew or had reason to know that such fuel was dyed." *Consolidated Edison Co. v. United States*, 34 F.Supp.2d 160, 164 (S.D.N.Y.1998).

■ Plaintiff does not dispute that an IRS assessment of a penalty is presumptively correct (*In re MDL–731 Tax Refund Litigation of Organizers and Promoters of Inv. Plans Involving Book Properties Leasing*, 989 F.2d 1290, 1303 (2d Cir.1993), *cert. denied sub nom. Madison Library, Inc. v. United States*, 510 U.S. 964, 114 S.Ct. 439, 126 L.Ed.2d 373 (1993); *Llorente v. Comm'r of Internal Revenue*, 649 F.2d 152, 156 (2d Cir.1981)) and that therefore a taxpayer who sues the IRS for a refund bears the burden of proving the invalidity of the IRS determination. *Helvering v. Taylor*, 293 U.S. 507, 515, 55 S.Ct. 287, 291, 79 L.Ed. 623 (1935); *In re MDL–731*, 989 F.2d at 1303; *Burke v. Comm'r of Internal Revenue*, 929 F.2d 110, 112 (2d Cir.1991). Consequently, plaintiff bears the burden of proving that the IRS determination in this case was without rational basis. *Llorente*, 649 F.2d at 156.

At trial and in its post-trial memorandum, plaintiff has posited several possible sources of the red dye discovered in truck four's propulsion tanks and has argued that plaintiff should not have been penalized under any of those scenarios. (Tr. 4–5; Plaintiff's Statement of Facts and Con-

clusions of Law ["Pl. Post–Trial Sub."] at 6.) First, plaintiff suggested that the residual red dye in truck four's hoses was accidentally injected into the propulsion tank when Manno refilled the truck's propulsion tank from the storage tank on March 1, 1996. Alternatively, plaintiff intimated for the first time at trial that the EPA officials or Inspector Suares may have contaminated truck four's propulsion tank fuel with red dye during the course of their testing procedures. Finally, Apollo now argues that it is not responsible for any conduct by its employees in violation of Apollo's rules. For the reasons that follow, plaintiff has failed to meet its burden of establishing the invalidity of the IRS determination.

### 1. *Plaintiff's theory of accidental contamination by Manno*

Plaintiff first suggests that the diesel fuel in truck four's propulsion tank was accidentally dyed red when Manno refilled the propulsion tank from the storage tank. Although truck four's storage tank contained clear fuel, plaintiff argues that since truck four previously contained red fuel, the hoses used to fill the propulsion tank must have contained residue, which dyed the fuel in the fuel tank. This argument is not convincing for several reasons.

The fuel sample taken by Inspector Suares was found to have a red dye concentration of 3.0 milligrams per liter. To qualify as tax-exempt dyed fuel for resale purposes, fuel must be dyed to a concentration of 11.2 milligrams per liter. (Tr. 20.)[3] Therefore, the fuel sample at issue was dyed to a concentration that exceeded twenty-five percent of the requisite concentration of red oil for resale purposes. (Tr. 27–28.) Even assuming that red oil residue remained in the hose, it strains credulity to believe that a few drops of fuel with a dye concentration of 11.2 milligrams per liter could dye the 15 to 20 gallons of fuel in the propulsion tank (*see* Tr. 26) to a concentration of 3 milligrams per liter.[4] Accordingly, even if Manno's testimony were accepted as truthful, this Court remains unpersuaded that any residue of red fuel in the hoses could have contaminated the fuel in the propulsion tank to the degree found by the IRS.[5]

Furthermore, Manno's trial testimony and prior sworn statements are riddled with inconsistencies. First of all, Manno's claim that he removed the fuel from the storage tank and submitted the resulting meter-stamped ticket to his dispatcher (Tr. 63–65, 66, 67) is substantially undermined by the absence of any such ticket reflecting the alleged transfer of fuel. Other discrepancies include Manno's prior affidavit alleging that he had been stopped by an IRS inspector—an account that he dis-

---

**3.** Treasury Regulation § 48.4082–1(b) provides that diesel fuel is exempt from the tax imposed by 26 U.S.C. § 4081 only if such fuel contains red dye "equivalent to at least 3.9 pounds of [dye] per thousand barrels of diesel fuel." In its motion for summary judgment, plaintiff argued that 3.0 milligrams per liter is equivalent to only 1.049 pounds per thousand barrels and that therefore plaintiff had not used "dyed fuel" for a taxable purpose. The Court rejected plaintiff's argument, concluding that the statute that plaintiff is alleged to have violated—26 U.S.C. § 6715(a)(2)—imposes a penalty if "any dyed fuel" is used for a taxable purpose, regardless of the concentration of red dye. *See* Memorandum and Order dated September 3, 1998, at 12–14 & n. 8. However, the IRS issues a warning but does not impose a penalty for a reading below one milligram per liter. (Tr. 89.)

**4.** This case therefore bears no resemblance to the facts of *In re FM Transmix Corp.*, 229 B.R. 583, 83 A.F.T.R.2d 99–1083 (E.D.N.Y.1999), where the court concluded that the debtor had produced credible proof that unbeknownst to the debtor, its supplier had apparently filled its clear oil storage tank with red oil.

**5.** At trial, plaintiff sought to demonstrate the strength and viscosity of the red dye: Plaintiff's counsel had Pullo dip a pencil into a jar of red dye, and then mix a drop of the dye into a jar of clear fuel. The clear fuel turned dark red. However, the demonstration overlooked the fact that any residue in the hoses would have been dyed *fuel*, rather than pure red *dye*.

claimed at trial, when he denied that he had ever made that statement. (Tr. 68, 72.) His testimony regarding why the fuel pump normally used to fill the propulsion tanks of Apollo's trucks was not working that day is likewise questionable. Although Manno had previously sworn that the pump was frozen (*see* Tr. 71), in the face of proof at trial that the temperature had not dropped below freezing (DX A and B), he hedged his testimony, claiming that by "frozen," he meant "not working." (Tr. 71–72.) Given this combination of discrepancies, the Court is not prepared to credit Manno's testimony.

The circumstantial evidence thus suggests that the presence of red fuel in the fuel tank was not the product of accidental contamination by Manno.

### 2. Outside Contamination and Chain of Custody Issues

Plaintiff also argues that the fuel in truck four's propulsion tank could have been contaminated with red dye by the EPA inspectors or by Inspector Suares. Additionally, plaintiff contends that the sampling results are unreliable because Inspector Suares did not follow all the proper procedures outlined in an IRS handbook for such inspections.

■ As an initial matter, the government relies on the "variance doctrine" and urges the Court not to consider these claims. (United States' Proposed Findings of Fact and Conclusions of Law ["Gov. Post–Trial Sub."] at 8–10.) Under this doctrine, a taxpayer may not "raise issues in a lawsuit not first raised in a refund claim." *Stern v. United States,* 949 F.Supp. 145, 150 (E.D.N.Y.1996) (quoting *McMorrow v. United States,* 1995 WL 3961 at *1 (N.D.Ill.1995)). In *Stern,* a tax refund action, the court dismissed a complaint for lack of jurisdiction where the

theory of recovery in the pleading was "wholly inconsistent" with the theory set out in plaintiffs' administrative claim. 949 F.Supp. at 149–50. In contrast, in *Cities Service Oil Co. v. United States,* 183 F.Supp. 164, 168 (S.D.N.Y.1960), the court concluded that it had jurisdiction over plaintiff's claims where "all the relevant facts were before the Collectors when they rejected the claims ... even if the wording of the claims might imply a right to recovery on a different theory than the theory relied upon by me."

■ Here, plaintiff's claim for a refund stated only that the fuel in the propulsion tank of truck four must have been accidentally "contaminated by remnants of dyed fuel in the hose" when Manno filled his propulsion tank from the storage tank that previously contained dyed fuel. (PX 1.) Plaintiff's claim for a refund in no way suggested that EPA officials or Inspector Suares might have contaminated the sample, and included no information regarding the tests by the EPA inspectors or by Suares. Nor did the claim for a refund raise any chain of custody issues. (*Id.*)

Thus, even generously construed, the allegations in plaintiff's refund claim did not imply a right to recovery based on the chain of custody and government contamination arguments that plaintiff now raises. Accordingly, the Court lacks jurisdiction over these claims. In any event, each of plaintiff's new theories is meritless.

First of all, for the reasons stated earlier,[6] the concentration of red dye in the fuel in the propulsion tank is inconsistent with a theory of accidental contamination from residue of red oil—whether by Manno or by government inspectors.[7]

Plaintiff further contends that Inspector Suares failed to follow proper procedures

---

**6.** *See supra* pp. 258.

**7.** Plaintiff argues that the Court should draw a negative inference from the fact that the government chose not to call the EPA inspec-

tors as witnesses. (Pl. Post–Trial Sub. at 19–20.) However, it is plaintiff who bears the burden of proof in this case, and plaintiff likewise chose not to call the EPA inspectors to testify.

in conducting his inspection and that therefore the results of the test of the sample were not reliable. (Pl. Post–Trial Sub. at 21–22.) In particular, plaintiff attempted to prove at trial that Inspector Suares' procedures were suspect, since they failed to comply precisely with the written instructions in a draft handbook from 1995–1996. (Tr. 115.) However, the manual was admitted into evidence for impeachment purposes only, not as substantive evidence of any legal requirement. (Tr. 116.) Moreover, although Inspector Suares did not show representatives of Apollo his credentials or give them a "Dyed Diesel Fuel Inspection Notice 916" or "Publication 1" on the day of the inspection at issue (Tr. 96–100), Suares had previously conducted monthly inspections at the Apollo facility, and had given Paul Pullo a Notice 916 a few times prior to March 7, 1996. (Tr. 98.) Against this backdrop, Inspector Suares' minor deviations from the draft handbook do not render the sample results unreliable.

Plaintiff also argues that chain of custody issues arise "from the manner in which the allegedly red dyed diesel fuel in the propulsion tank of truck four came to the attention of … Suares." (Pl. Post–Trial Sub. at 19.) Relying on *United States v. Grant*, 967 F.2d 81, 81–83 (2d Cir.1992), *cert. denied*, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993), plaintiff asserts that testimony from the EPA inspectors was required in order to establish chain of custody. (Pl. Post–Trial Sub. at 20.) However, after the EPA inspectors told Inspector Suares that they had discovered red fuel in the propulsion tank of truck four, he took his own sample from that tank (Tr. 85–86), and it was Suares' sample that was tested and formed the basis for the penalty at issue here. Since the EPA inspectors took a different sample, their testimony was not required to establish chain of custody.

Moreover, plaintiff's reliance on *Grant* is misplaced. The Second Circuit held in *Grant* that where the tested drugs were not themselves offered into evidence, the admissibility of self-authenticating evidence—there, the chemist's testimony—turned on whether it was "relevant," that is, whether there was "some likelihood that the substance tested by the chemist was the substance seized at the airport." 967 F.2d at 83. Any remaining challenges to chain of custody went to the weight of the evidence, not its admissibility. *Id.*

■ Here, as in *Grant*, the tested substance—the fuel sample—was not offered into evidence, and thus the question posed in determining the admissibility of the chemist's report (DX E) was whether there was "some likelihood that the substance tested by the chemist was the substance" extracted by Suares on March 7, 1996. *Grant*, 967 F.2d at 83. The chemist's report was admitted under Fed. R.Evid. 803(8)(C), an exception to the hearsay rule that permits the admission in a civil case of factual findings after investigation by a public agency "unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8)(C). Under either analysis, plaintiff's challenges to the procedures followed by Suares in processing the sample do not so undermine the test results as to render the chemist's report inadmissible or persuade the Court that the IRS erred in imposing a penalty based on that report. *See Bradford Trust Co. of Boston v. Merrill Lynch*, 805 F.2d 49, 54 (2d Cir.1986) (Rule 803(8)(C) should be applied "in a common sense manner, subject to the district court's sound exercise of discretion in determining whether the hearsay document offered in evidence has sufficient independent indicia of reliability to justify its admission").[8]

8. The burden of showing a lack of trustworthiness under Rule 803(8)(C) is on the party who opposes the admission of the document. *Ariza v. City of New York*, 139 F.3d 132, 134 (2d Cir.1998). Furthermore, there must be "an affirmative showing of untrustworthiness, beyond the obvious fact that the declarant is not in court to testify." *Bradford*, 805 F.2d at

■ Inspector Suares testified that he took a sample from the fuel tank of truck four. The sample remained in his custody until he returned to his office, where he sent the sample to the laboratory. (Tr. 89.) The sample was in a clear bottle, on which Suares wrote plaintiff's name and identified the truck and the license plate number. (Tr. 86.) Attached to the bottle was a label with an identifying number. (Tr. 86, 87.) The label was one of three parts of a "Form 9667" (*see* PX 8); one part was wrapped around the bottle, one part was kept in the file, and one part was sealed onto the bottle. (Tr. 87.) After sending the sample to the laboratory for analysis, Inspector Suares received a report from the laboratory, which was admitted into evidence as DX E. (Tr. 92–93.)

Plaintiff suggests that Suares' correction of notations on several of the records undermines the chain of custody and renders the test results suspect. This Court disagrees. Suares testified that he changed the date on his work history sheet when he realized it was off by a day. (Tr. 122.). He also made several minor changes to the "chain of custody" label (PX 8)—changing the address from 500 Kingsland Avenue to 490 Kingsland Avenue, based on his understanding that the latter was the correct address for Apollo; correcting the field test reading that he originally received on site; and adding two digits to the reference number to indicate the district. (Tr. 123–25.)

These changes in no way suggest that the test was not performed on plaintiff's truck, or that the laboratory's findings do not relate to the fuel sample taken by Suares from truck four. Therefore, the Court finds that Suares' testimony provides sufficient indicia of reliability to sustain the admission of the laboratory report and the IRS's imposition of a penalty. Furthermore, Suares' testimony and the laboratory report establish that the fuel taken from truck four was dyed to a concentration of 3 milligrams per liter—a concentration inconsistent with a theory of accidental contamination.

### 3. *Respondeat Superior*

Based on all the evidence adduced at trial, and the reasonable inferences to be drawn therefrom, this Court has concluded that plaintiff failed to refute the IRS's implicit finding that one of Apollo's employees or agents intentionally introduced dyed fuel into the propulsion tank of truck four. Plaintiff, in its closing statement and post-trial submission, has argued that in the event the Court makes such a finding, Apollo should not be penalized for acts of its employees that are prohibited by Apollo's employee procedures and are contrary to its interests. (Tr. 141; Pl. Post–Trial Sub. at 17–18.) Plaintiff relies on *Kahn v. Chase Manhattan Bank,* 760 F.Supp. 369, 373 (S.D.N.Y.1991), which holds "that the independent acts of an employee not acting in his employer's interest are not a sufficient basis to hold the employer liable under RICO."

■ Even if *Kahn* were applicable outside the RICO context,[9] this case is clearly distinguishable. But for detection and an IRS penalty, the employer-plaintiff would clearly benefit from an employee's illegal use of non-taxable fuel to fill the propulsion tanks of the trucks, since the employer would pay less in fuel taxes.

54 (quoting *Kehm v. Procter & Gamble Mfg. Co.,* 724 F.2d 613, 618 (8th Cir.1983)).

**9.** In declining to impose civil RICO liability on a bank employer on the basis of respondeat superior, the *Kahn* court expressly stated that "[i]mposing vicarious liability would defeat the purpose of RICO, 'which, after all, is to reach those who ultimately profit from racketeering, not those who are victimized by it.'" *Id.* (quoting *Haroco v. American Nat'l*

*Bank and Trust Co. of Chicago,* 747 F.2d 384, 402 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985)). In contrast, here the purpose of the IRS regulation is to insure that non-taxable fuel is not used for taxable purposes, and the regulation is intended to penalize the person or entity who would benefit from the illegal use of non-taxable fuel.

Under traditional principles of respondeat superior, the employer is vicariously liable for the wrongful acts of its employee where, as here, the act was committed by the employee within the scope of his or her employment. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir.1995); *United States Lighterage Corp. v. Petterson Lighterage & Towing Corp.*, 142 F.2d 197 (2d Cir.1944). Plaintiff argues that it should not be held liable for the intentional misuse of dyed fuel by one of its employees, as such actions would violate Apollo's explicit instructions to its employees. (Pl. Post-Trial Sub. at 17.) However, "[a]n employee who acts in direct contradiction of his employer's instructions can still be within the scope of his employment." *O'Boyle v. Avis Rent–A–Car Sys., Inc.*, 78 A.D.2d 431, 443, 435 N.Y.S.2d 296 (2d Dept.1981) (upholding jury's imposition of vicarious liability on employer for 16–year–old employee's unauthorized use of company car). "[T]he mere existence of employer prohibitions against [certain] conduct on the part of the employee cannot absolve the employer of liability when the employee, in serving the master's interests, violates the prohibitions." *Essig v. United States*, 675 F.Supp. 84, 88 (E.D.N.Y.1987) (agent's violation of DEA rule against drinking intoxicating beverages on the job did not absolve government of liability for resulting traffic accident). Furthermore, plaintiff offers no evidence or even theory to suggest that Manno or any other Apollo employee had any personal motivation to fill the propulsion tank of truck four with red fuel. *Cf. Ray v. Metro. Transp. Auth.*, 221 A.D.2d 613, 615, 634 N.Y.S.2d 160, 162 (2d Dept. 1995), *lv. to appeal denied*, 87 N.Y.2d 810, 642 N.Y.S.2d 858, 665 N.E.2d 660 (N.Y.), *cert. denied*, 519 U.S. 822, 117 S.Ct. 80, 136 L.Ed.2d 38 (1996) (employer not liable for guard's unauthorized and personally motivated assault). Plaintiff, not Manno, pays taxes on the clear fuel used to operate plaintiff's trucks, and if plaintiff had not been caught, plaintiff would have reaped the benefit of lower taxes. Therefore, this Court rejects plaintiff's respondeat superi-

or argument. *Cf. Consolidated Edison*, 34 F.Supp.2d at 165 (upholding IRS penalty pursuant to 26 U.S.C. § 6715(a)(2), notwithstanding argument that ConEd's station attendants lacked familiarity with diesel fuel regulations; "[t]he key issue is whether those attendants, and therefore ConEd, knew or had reason to know that the diesel was dyed").

## CONCLUSION

For the foregoing reasons, plaintiff's request for a refund is denied. The Clerk is directed to promptly enter judgment in defendant's favor, dismissing the complaint, and to mail a copy of this opinion to all counsel of record.

**SO ORDERED.**